**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

ANDREW R. PERRONG
1657 THE FAIRWAY #131
JENKINTOWN, PA 19046

       Plaintiff

vs.

HOPE TREE PROPERTIES LLC
502 WEST 7TH STREET, SUITE 100
ERIE, PA 16502,

and

DANIEL KESSLER
1501 COTSWALD CT
WEST CHESTER, PA 19382

       Defendants.

Case No. 2:23-cv-00603-JDW

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

### Preliminary Statement

1.     Plaintiff Andrew R. Perrong ("Plaintiff"), brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2.     Plaintiff alleges that Hope Tree Properties LLC, and its owner, Daniel Kessler, commissioned, through a third-Party whom Defendants know but have so far refused to identify, a series of automated, illegal telemarketing "robocalls" to originate new customers for their real estate consulting company. These calls were sent to telephone numbers listed on the National Do Not Call Registry and for which the called party is charged for the calls, like Mr. Perrong's

1

number, which is prohibited by the TCPA. The calls were made either directly by Kessler, or his agents whom Kessler knows but refuses to identify, for his company Hope Tree Properties LLC.

3.      The Plaintiff never consented to receive such calls, which were placed to him for telemarketing purposes.

## Parties

4.      Plaintiff Andrew R. Perrong is a Pennsylvania resident, and a resident of this District.

5.      Defendant Hope Tree Properties LLC, is a Pennsylvania company that makes telemarketing calls to this District both directly and using third-party lead generation call centres, just as it did with Plaintiff.

6.      Defendant DANIEL KESSLER is an individual who is a resident of Pennsylvania.

## Jurisdiction & Venue

7.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012).

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the automated calls to the Plaintiff were placed into this District.

## The Telephone Consumer Protection Act

9.      In 1991, Congress enacted the TCPA to regulate the explosive growth of the automated calling industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The TCPA Prohibits all Automated Calls To Protected Numbers

10.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(A)(iii).

11.    Congress singled out these services for special protection either because Congress realized their special importance in terms of consumer privacy and therefore protected them (as in the case of cellular phones), or because the numbers are assigned to services, like Mr. Perrong's VoIP service, for which the called party is charged, thus shifting the cost of automated or prerecorded messages onto consumers. *See Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2363, (2020) (Gorsuch, J. & Thomas, J., concurring in part and dissenting in part).

12.    According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such messages are prohibited because, as Congress found, automated or prerecorded messages are a greater nuisance and invasion of privacy than live ones, are costly, and are inconvenient.

13.    Under the TCPA, a text message is treated as a call. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016).

14.    The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A).  *See* 47 U.S.C. § 227(b)(3).

15.    This cause of action applies to users of any one of the four protected services (pager, cellular, specialized mobile radio [i.e. radiotelephony locator beacons or dispatch

systems], or another radio common carrier service [i.e. ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged for the call. *See Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *6 (E.D. Pa. July 15, 2021).

16.     "Non-emergency prerecorded voice or autodialed calls to [the destinations enumerated in 47 U.S.C. § 227(b)(1)(A)] are permissible only with the prior express consent of the called party." This includes *any* non-consensual calls made for non-emergency purposes, regardless of *whether or not* they are informational, telemarketing, telephone solicitations, or similar such calls. *See* FCC Enforcement Advisory: *Tel. Consumer Prot. Act Robocall & Text Rules - Biennial Reminder for Pol. Campaigns About Robocall & Text Abuse*, 31 FCC Rcd. 1940, 1941 n.6 (2016) [hereinafter FCC Advisory].

17.     Importantly, this Court has already held that non-consensual, non-emergency calls placed using an ATDS or a prerecorded voice to the *same telephone number at issue in this case* violate 47 U.S.C. § 227(b)(1)(A), regardless of the purpose of the call. *Victory Phones*, 2021 WL 3007258, at *6 (rejecting claim that non-commercial survey calls were exempt and holding that "[T]he operative language of the TCPA is unambiguous. Section 227(b)(1)(A) prohibits placing artificial and pre-recorded voice calls to a variety of telephone numbers."). To hold otherwise would read the words "any person" and "any call" out of the statute. *See id.*

The National Do Not Call Registry

18.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

19.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

20.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers whose numbers are on the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## **Factual Allegations**

21.     Defendant Hope Tree Properties LLC operates a real estate consulting company that offers to buy and sell houses, including "discussing options for foreclosure" and preparing real estate paperwork.

22.     To generate leads, Hope Tree, through an as-yet unidentified marketing company it hired, makes telemarketing calls to customers who have never had never had a relationship with Hope Tree, who have never consented to receive their calls, and indeed have never even owned the properties Hope Tree attempts to provide its services for.

23.     Daniel Kessler owns and operates Hope Tree.

24.     One of the strategies used by Defendants involves the use of automated calls.

25.     Defendants send out these call blasts *en masse* to telephone numbers throughout the area, hoping they reach someone interested in their real estate services.

Personal Liability Under The TCPA

26.     Defendant Daniel Kessler was at all times relevant the owner of Hope Tree and is therefore responsible for any conduct purportedly carried out only in such name.

27.     Under the TCPA, an individual such as Kessler may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*.

47 U.S.C. § 217 (emphasis added).

28.     Kessler personally participated in the actions complained of by: (a) envisioning, authorizing, supervising, controlling, and directing the marketing conduct described herein, including the telephone conduct; (b) personally selecting the vendor that Hope Tree used to dial phone numbers and telemarketing; (c) verifying and potentially drafting the scripting that would be used on the calls; (d) selecting the dialing equipment, telephone services, manpower, and suppliers of the same used to make the calls; (e) personally placing at least one of the calls; (f) personally setting up accounts and telephone services for making the calls; (g) verbally insulting the Plaintiff and refusing to place the Plaintiff on the internal Do Not Call List; and (h) leading, supervising, and ensuring (non)compliance and verbal harassment with Hope Tree's legal and regulatory obligations, including the TCPA.

The Calls to Mr. Perrong

29.     Plaintiff Perrong is a "person" as defined by 47 U.S.C. § 153(39).

30.     Plaintiff's telephone number (the "Number"), 215-947-XXXX, is on the National Do Not Call Registry and has been continuously since 2005.

31.     The Number has also been listed on the Pennsylvania Do Not Call Registry.

32.     Neither Defendants, nor the third-party marketing company they hired to make calls, are registered as telemarketers with the Attorney General of Pennsylvania.

33.     Despite this registration, the Defendants, either directly or vicariously through the marketing/lead generation company they hired, sent at least three calls and two text messages

placed using an ATDS and a prerecorded voice to Plaintiff on February 8, 14 and 15, 2023 from the Caller IDs 267-314-6729, 267-367-5031, 610-553-3385, and 717-471-5718.

34.     Of those calls, Plaintiff complains of two violative calls and two violative text messages here. Plaintiff does not currently complain for the third call, but reserves the right to replead this call if discovery reveals that such call is actionable under the TCPA.

35.     The Number is assigned to a Voice over Internet Protocol (VoIP) telephone service, which allows for voice calls to be placed over a broadband Internet connection.

36.     That Number, which is assigned to a VoIP telephone service, is charged for each call it receives.

37.     The VoIP telephone service for the Number is Anveo.

38.     The service charges a ring charge of $0.005 for the provision of Caller ID Name lookup information for each call placed to the Number, even if the call is not answered.

39.     The service also charges a per-minute charge of $0.004 per minute for voice charges for each minute of talk time, including voicemail time, for each call placed to the Number.

40.     The service charges $0.01 for each text message sent or received.

41.     The Number is therefore "assigned to a . . . service for which the called party is charged for the call" and any calls placed to that number, as well as text messages sent to that number, are subject to the restrictions enumerated in 47 U.S.C. § 227(b)(1)(A)(iii).

42.     Despite this, Defendants, through an offshore call center they knowingly hired but refuse to identify, placed the first call to the Number from the caller ID 267-314-6729 on February 8, 2023.

43.     The telephone service provider for this Caller ID is Level 3 Communications and the caller ID transmitted the generic location-based CNAM of "PHILADELPHIA PA."

44.     Plaintiff answered this call, but there was nobody on the other side and the call disconnected after 7 seconds of silence.

45.     Despite this, Defendants placed the next call, again through an offshore call center they knowingly hired but refuse to identify, to the Number from the caller ID 267-367-5031 on February 14, 2023.

46.     The telephone service provider for this Caller ID is Peerless Telecom and the caller ID transmitted the identical location-based CNAM of "PHILADELPHIA PA."

47.     When called back, the telephone number 267-314-6729 led to the same offshore call center as the 267-367-5031 number. In fact, calling both numbers sometimes resulted in the same individual on the other line.

48.     After the filing and service of the original Complaint in this lawsuit, however, both the 267-314-6729 and 267-367-5031 numbers were disconnected. Plaintiff can only assume that the Defendant is spoliating evidence and attempting to cover its tracks by doing so or by directing the call center it hired to do the same.

49.     When Plaintiff answered the call on February 14, he heard a brief snippet of pre-recorded hold music before his call was connected to a human being.

50.     Approximately 8 seconds later, the Plaintiff spoke with an offshore bloke with a heavy accent named "John" inquiring if Plaintiff "still owned a property" at a specific address.

51.     "John" stated that he was calling from a group of "real estate investors and sellers."

52.     In an effort to identify the caller, the Plaintiff attempted to ascertain the name of the company and who these investors and his "partners" were, but was told that the only name was "Dan." This individual, of course, is Defendant Dan Kessler.

53.     "John" stated that "basically" his "partner," "Dan" would schedule an appointment for the Plaintiff to call Defendants on February 15 between 4:00 and 5:00 PM. "John" also stated that "Dan" would be sending Plaintiff a text message with the meeting details. Plaintiff stated that he would *only* like to receive an email instead.

54.     The caller was understandably cagey about revealing the true and full identity of the Defendants who hired him because the calls were illegal. Moreover, masking such calls prevents competitors from identifying the caller and also protects ill will toward Defendant's brand against allegations of unlawful telemarketing conduct identified through the simple act of asking the offshore caller from whence they are calling.

55.     Plaintiff provided a unique email address in order to ascertain the caller's identity. Plaintiff made clear that he would call the Defendants back if he was interested and that the Defendants were only to send him an email, not call or text him. Plaintiff explicitly asked that no text messages be sent and that an email only be sent instead. Plaintiff made clear that under no circumstances were Defendants or their agents to call him or text him.

56.     At no time on or immediately prior to February 14 had the Plaintiff interacted with any other home buyer or seller, or any other caller whatsoever referencing the address provided in the call, which is not Plaintiff's address.

57.     The logical conclusion, therefore, is that the Defendants directed the telemarketing lead generation company it admits it hired to make the calls.

58.     Despite this clear revocation of any purported consent and indication he did not want to be contacted, Plaintiff received a text message from the Caller ID 610-553-3385 at 10:03 PM on February 14.

59.     The telephone service provider for this Caller ID is Twilio.

60.     The message stated:

```
Hi Stefania,

Your phone appointment to receive a cash offer for
your home, [redacted] has been confirmed for
Wednesday, February 15, 2023 4:30 PM. Please let us
know if you have any questions in the meantime. We
look forward to speaking to you soon.

- Dan
```

61.     The redacted address in this message was the same address the caller mentioned in the February 14 call.

62.     Plaintiff did not respond to this message. Despite this, the Plaintiff received another message from the same caller ID at 2:30 PM on February 15.

63.     That message stated:

```
Hi Stefania. This is just a reminder for your home
cash offer phone appointment today on Wednesday,
February 15, 2023 4:30 PM for your home [redacted].

Please reply "yes" to confirm you will be available.
I'll be calling you.

- Dan
```

64.     The "Dan" listed in these automated, pre-recorded text messages is Defendant Dan Kessler. Based on "John's" declaration, it appears Defendant sent the canned, pre-written messages himself.

10

65.     Level 3 Communications, Peerless Telecom, and Twilio do not place calls, nor do they "register" telephone numbers. Rather, they provide the telephone service for the aforementioned caller ID numbers. Individual subscribers like Defendants or the third-party call centers they hire can then connect this telephone service to an ATDS and use the ATDS to place calls, either directly through an on-premise ATDS like ViciDial or through the use of another vendor that provides the ATDS software through a web interface like CallFire.

66.     Unlike most telephone service providers, however, these providers support and indeed encourages using programmable communications software, including ATDS systems like ViciDial and CallFire, on their platforms. By contrast, most other telephone providers, including Plaintiff's, expressly forbid use of their services in such a way in their terms of service. *See, e.g.*, *Terms of Use*, ANVEO (May 24, 2018), http://www.anveo.com/consumer/legal.asp ("Use of Predictive Dialers, Auto Dialers, Telemarketing Devices, Lead Generators and other simular programs is prohibited. All calls made using such programs will be charged $2 per minute rate (60/60 billing interval) and $0.1 per dial attempt.").

67.     Plaintiff did not respond to the text messages or reply "yes." Despite this, Plaintiff received a call on February 15, at 4:28 PM from the caller ID 717-471-5718. Plaintiff does not allege anything violative regarding this call at this time.

68.     This telephone number appears to be Defendant Kessler's personal cell phone.

69.     During the call, Defendant Dan Kessler was on the line and identified himself as such and stated that he was calling from "Hope Tree Properties."

70.     Immediately, Plaintiff stated for the Defendant not to call Plaintiff again.

71.     Defendant Kessler launched a verbal tirade on the Plaintiff in response too explicit and inappropriate to set forth in unredacted form in a federal court pleading. He stated,

```
"We have an appointment. We have an appointment set for
today. . . . F**k you, you f*****g c**t! Eat s**t you
f*****g c**t! Don't f*****g tell me you didn't do this and
you gotta do that and I'm gonna sue you. Come find me in
person. Don't be such a f*****g c**t. . . . This call is
being recorded. I'm going to come after you and f*****g
nena (inaudible)."
```

72.     The call could not possibly have been targeted toward the Plaintiff since the

Plaintiff does not own the property address for which Defendants attempted to sell their real

estate services. In fact, the purpose of the call must have been to *sell* the Plaintiff property or real

estate services, as Plaintiff owns no real property.

73.     Rather, it appears Defendants selected numbers to be called sequentially (or

possibly randomly) and then used publicly available databases to identify any potential

properties the user of the of the telephone number might own when such randomly or

sequentially selected call was answered.

Defendants' Use of an ATDS and Artificial or Prerecorded Voices

74.     The calls complained of were all conducted using an Automatic Telephone

Dialing System (ATDS) and were also conducted either with a pre-recorded voice or pre-

programmed, canned text messages. As the Supreme Court recently clarified, the key feature of

an ATDS is the capacity to store numbers to be called using a random or sequential number

generator or to produce numbers to be called using a random or sequential number generator.

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

75.     Besides being placed with an ATDS, the calls complained of were placed using an

"artificial or prerecorded voice" because they played pre-recorded hold music when the Plaintiff

answered.

76.     Besides being placed with an ATDS, the two text messages were also placed using an "artificial or prerecorded voice" as outlined under 47 U.S.C. § 227(b)(1)(A).

77.     Although it is an issue of first impression in the Third Circuit, Plaintiff contends that pre-programmed, "canned" text messages and replies meet the statutory definition of an "artificial or prerecorded voice." As a preliminary matter, a text message is treated as a call for TCPA purposes. *Campbell-Ewald Co.*, 577 U.S. at 156. And pre-written templates of text qualify as such, as the plain meaning of "voice," to mean the "faculty or power of utterance, speech; sound regarded as, or likened to, vocal utterance, as the *voice* of the sea; anything likened to human speech as an instrument or medium of expression, as the ballot is the *voice* of the people; expressed wish, choice, or opinion, hence, right to express one's wish, etc.: vote, as to have no *voice* in the matter." Webster's Collegiate Dictionary (1936).

78.     Indeed, pre-written templates of text have stark parallels to illegal soundboard technology, where an agent (usually in a foreign country) sits in front of a "board" of buttons and presses each one to play a pre-recorded audio response to the called party. *See Black v. First Impression Interactive, Inc.*, No. 21 C 3745, 2022 WL 169652, at *5 (N.D. Ill. Jan. 19, 2022) (collecting cases). The called party cannot hear or interact with the agent; the only interaction is accomplished through the board of pre-recorded audio responses. The only meaningful difference, and one without a distinction, is that an automated texting system consists of a board of pre-written templates to send to an individual.

79.     The Third Circuit recently clarified that "Congress envisioned a broad understanding of 'equipment'" that constitutes an ATDS. It also clarified that the analysis of whether an ATDS was *used* in violation of the TCPA centers around "whether the defendant employ[s] [ATDS] capacities to make automated calls," *Panzarella v. Navient Sols., Inc.*, 37

F.4th 867, 873, 878 (3d Cir. 2022). In so doing, it held that Congress intended to "ban all autodialed calls" because Congress "found autodialer technology to be uniquely harmful." *Id.* at 879 (cleaned up).

80.     In enacting the ATDS prohibition, the Third Circuit cited favourably to Congressional understanding "that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications," including by "relying on computerized databases containing telephone numbers during their dialing campaigns." *Id.* at 880 (cleaned up). The Third Circuit held that, in passing the TCPA's ATDS prohibition, Congress intended to remedy the problems caused by callers using computer software to dial numbers randomly or sequentially from a list or database. *See id.*

81.     Under *Panzarella*, a system that uses a random or sequential number generator to produce each telephone number to be called from a list of telephone numbers, and then dials those numbers, is by definition an ATDS. This is so even if the telephone numbers in the list themselves were not randomly or sequentially generated. *See id.* at 879-880.

82.     The system(s) Defendants or their agents used to place the calls to Plaintiff is/are an ATDS because it would be illogical to use some non-automatic trigger to dial the number from a list, have the Plaintiff answer it, and only then connect it to a human being or play a pre-recorded message. It would also be illogical to send the text messages in a non-automated manner, as they are perfectly formatted, read as if they are carefully scripted, and even contain paragraph spacing, which indicate that they were sent using pre-written templates.

83.     Furthermore, audible pauses, clicks, hold music, and no human being on the other side of the line when the call is answered are hallmark indicia of ATDS systems, particularly ones that predictively vary the automatic calling rate to optimize time human representatives

spend. It supports the inference that Defendants, though the agents they hired, used an ATDS, such as one which "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a preproduced list." *Facebook*, 141 S. Ct. at 1171 n.7.

84.     The calls were placed by large, bulk telephone service providers like Level 3 Communications, Peerless Telecom, and Twilio. In particular, Twilio operates a computerized platform designed for making high volumes of automated, sequential or random calls. Twilio's website boasts the ability to make calls with "indefinite scaling," support up to 250 participants at a time, and mask caller information. *See Voice With the Power of Programmability*, TWILIO, https://www.twilio.com/voice [https://archive.ph/ktY0A].

85.     Indeed, Twilio's documentation outlines in detail the computer programming code necessary to make automated calls from a list, including a computerized database of numbers, at a rate of one call per second, in addition to the code needed in order to tell the system what action to take depending on if a party answers. *See Making Calls*, TWILIO DOCS, https://www.twilio.com/docs/voice/make-calls [https://archive.ph/kVbSz].

86.     As this Court has remarked, other courts have held, post-*Facebook*, that allegations similar to those as here of the absence of a relationship between the parties, pauses and delays in audio, inaccurate list data, and the random or automated nature of the automation device, are all indicia of use of a random or sequential dialing device that gives rise to the inference at the pleadings stage that an ATDS was used to make the calls. *See Camunas v. Nat'l Republican Senatorial Comm.*, No. 21-1005, 2021 U.S. Dist. LEXIS 100125 at *11 (E.D. Pa. May 26, 2021). Post-*Facebook*, ATDS issues are summary judgment ones.

87.     No facts exist here to support the conclusion that Defendants were calling a curated list of past individuals they have previously interacted with. Plaintiff does not and has

never owned the property Defendants were looking to provide real estate services. By contrast to a company that calls phone numbers *en masse* to the public, a company that uses a select list of customers based on specific accurate criteria does not place calls using an ATDS because such calling uses a database targeting existing customers' information rather than computer-generated tables or lists of individuals to be called. *See Panzarella*, 37 F.4th at 881–882.

88.     *Panzarella* stands for the proposition that, when using a list of numbers to contact people, the computer must *use* something other than a random or sequential number generator to select the numbers to be called. Other triggers, such as birthdays or account delinquency, are neither random nor sequential, and thus *using* a dialer to place calls with such criteria is not using an ATDS. *See id.* at 879-881.

89.     *Facebook* did not use an ATDS because it did not use random or sequential means to select numbers to send text messages to. Rather, it used *a specific user action*, compromised account security, to send the messages. *Facebook*, 141 S. Ct. at 1168. In other words, an account data breach, not random or sequential selection, was used to send the text message. Similarly, the Ninth Circuit recently held in *Brickman v. United States* that Facebook did not use an ATDS when it sent birthday text messages because the *birthdays*, not random or sequential number generators, were used to draw numbers to be called. 56 F.4th 688 (9th Cir. 2022).

90.     Likewise, the defendant in *Panzarella* did not *use* an ATDS because it used the select criteria of delinquent borrowers to dial numbers. Put another way, delinquency, not random or sequential means, was used to select numbers from a list of numbers associated with student loan accounts and then dial them. *Panzarella*, 37 F.4th at 882.

91.     Plaintiff is ignorant of the exact process by which the Defendants used the system they connected to the various services. However, no facts exist to show that Defendants called

16

the Plaintiff in a targeted manner. Moreover, "The newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage." *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021); *accord Miles v. Medicredit, Inc.*, No. 4:20-cv-01186-JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021).

92. Plaintiff has sufficiently pled at the pleading stage more than adequate facts to support a showing that the system Defendants used to contact the Plaintiff meets the definition of an ATDS and that Defendants used random or sequential methods to select numbers to be called.

93. The most obvious such non-random and non-sequential criteria, persons actually interested in purchasing real estate services from the Defendants and who had provided their information to the Defendants, is obviously lacking here since the Plaintiff has not owned the property sought to have services provided to it nor interacted with the Defendants. Moreover, if Defendants do proffer a potential criterion other than random or sequential selection used to make the calls, Plaintiff is nevertheless entitled to discovery on that issue to determine whether or not such a criteria was used in the Plaintiff's case and whether or not it was truly neither random nor sequential. This is a summary judgment issue, not a motion to dismiss one.

Defendants' Conduct Violates the TCPA

94. Defendants cooperated with and hired an unidentified third-party lead generator to send the first two calls. Defendants admitted to as much in their motion to dismiss Plaintiff's original complaint. Additionally, counsel for Defendants admitted this on a telephone call.

95. Defendants are liable for this as-yet unidentified lead generator's conduct under common law principles of agency because they "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

96.     As evidenced by the callers stating that they were calling from a group of "real estate investors and sellers" and were directed by an individual named "Dan" to make the calls, the third-party call center manifested that it was acting under actual or apparent authority to make the calls. Additionally, by accepting the benefit of such leads generated by illegal calls, Defendants ratified the illegal conduct described herein.

97.     A May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." 28 FCC Rcd at 6592-593 (¶ 46).  Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent."  *Id.* at 6593 (¶ 46).

98.     As is common in the telemarketing space, Defendants maintained interim control over the lead generators' actions, including directing how often, how many, and where to target their illegal calling and lead generation conduct. Indeed, if companies were not liable for the illegal actions of their third-party lead generators, the TCPA would lose much of its force and allow such companies to escape liability in favour of judgment-proof offshore lead generators.

99.     The communications received by Plaintiff demonstrate that they were sent for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services as they sought to have him purchase and invest in Defendants' real estate services. The calls therefore qualified as telemarketing. 47 C.F.R. § 64.1200(f)(12).

100.     In fact, Defendants themselves admit that they provide "home selling services". *Terms and Conditions of Use*, HOPE TREE PROPS., https://hopetreeproperties.com/terms-of-use/ [https://archive.is/GrMOZ].

101.    The Plaintiff never provided his consent or requested the calls.

102.    Defendants called multiple times, despite Plaintiff's number being on the National

Do Not Call Registry.

103.    The calls were not necessitated by any emergency.

104.    Plaintiff was harmed by the calls. At least one of the calls occurred while he was

attending a law school class. He was temporarily deprived of legitimate use of his telephone and

his privacy was improperly invaded. The Plaintiff was charged for the calls. Moreover, they

injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and

disturbed the solitude of Plaintiff.

**Legal Claims**
**Count One:**
**Violation of the TCPA's Prohibition Against Automated Calling**
**Via Pre-Recorded Message**

105.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set

forth herein.

106.    The foregoing acts and omissions of Defendants and/or their affiliates, agents,

and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple

violations of the TCPA, 47 U.S.C. § 227, by sending calls, except for emergency purposes, to the

telephone number of Plaintiff using an artificial or prerecorded voice.

107.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or

entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff is

entitled to an award of $500 in damages for each and every call made to his telephone number

for which he is charged for the call using an artificial or prerecorded voice in violation of the

statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

108.    Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls or sending messages, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

109.    The Defendants' violations were willful and/or knowing.

**Count Two:**
**Violation of the TCPA's Prohibition Against Automated Calling**
**With an Automatic Telephone Dialing System (ATDS)**

110.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

111.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to the telephone number of Plaintiff using an ATDS.

112.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff is entitled to an award of $500 in damages for each and every call made to his telephone number for which he is charged for the call using an ATDS in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

113.    Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

114.    The Defendants' violations were wilful and/or knowing.

**Count Three:**
**Violation of the Pennsylvania Telemarketer Registration Act**
**73  Pa. Cons. Stat. § 2241**

115.    By placing at least four telemarketing calls to the Plaintiff without registering as telemarketers under Pennsylvania law, Defendants, jointly and severally, violated 73 Pa. Cons. Stat. § 2243. Moreover, by failing to identify themselves in the calls, Defendants, jointly and severally, violated 73 Pa. Cons. Stat. § 2245.1.

116.    This constitutes four violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. 73 Pa. Cons. Stat. § 2246(a).

117.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the Pennsylvania Telemarketer Registration Act (PTRA), 73 Pa. Cons. Stat. § 2241, including by making calls to Plaintiff's number, on the Pennsylvania Do-Not-Call registry, without registration.

118.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the PTRA, 73 Pa. Cons. Stat. § 2241, Plaintiff is entitled to an award of $300 in damages for each and every call made to his telephone number in violation of the statute, pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201. *See* 73 Pa. Cons. Stat. § 2246(a).

119.    Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from violating the PTRA in the future.

**Count Four:**
**Violation of the TCPA's Implementing Regulations**
**Codified at 47 C.F.R. § 64.1200**

120.    By placing at least four telemarketing calls to the Plaintiff, whose number is on the Do-Not-Call registry Defendants, jointly and severally, violated 47 U.S.C. § 227(c)(5) by violating the implementing regulations codified in 47 C.F.R. § 64.1200(c).

121.    This amounts to five violations since Defendants committed one violation per call of calling a number on the national Do-Not-Call registry. 47 C.F.R. § 64.1200(c)(2). In addition, with respect to the 10:03 PM text message, Defendants violated the calling hour restrictions set forth in 47 C.F.R. § 64.1200(c)(1).

122.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute at least five violations of the TCPA, 47 U.S.C. § 227(c), codified at 47 C.F.R. § 64.1200, by refusing to scrub against the National Do-Not-Call registry, and, in the case of the 10:03 PM text message, violating the calling hour restrictions of the TCPA.

123.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the TCPA, 47 U.S.C. § 227(c), Plaintiff is entitled to an award of $500 in damages for each and every call and violation made to his telephone number in violation of the TCPA's implementing regulations codified at 47 C.F.R. § 64.1200, pursuant to 47 U.S.C. § 227(c)(5)(B).

124.    Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from violating the TCPA, 47 U.S.C. § 227(c), by making calls in violation of any of the TCPA's implementing regulations in the future.

125.    The Defendants' violations were knowing and/or willful. Accordingly, the
Plaintiff seeks up to treble damages of the $500 per violation award, as provided in 47 U.S.C. §
227(b)(3)(B).

## Relief Sought

WHEREFORE, Plaintiff requests the following relief:

A.    Injunctive relief prohibiting Defendants from calling telephone numbers using an
artificial or prerecorded voice and/or ATDS.

B.    Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500
in damages for each violation or—where such regulations were willfully or
knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. §
227(b)(3) or 47 U.S.C. § 227(c)(5).

C.    Because of Defendants' violations of the PTRA, Plaintiff Perrong seeks for
himself $300 in damages for each violation, pursuant to 73 Pa. Cons. Stat. § 201-
9.2(a).

D.    Such other relief as the Court deems just and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Dated: **April 17, 2023**

_____/s/_____
Andrew R. Perrong
*Plaintiff Pro-Se*
1657 The Fairway #131
Jenkintown, PA 19046
Phone: 215-791-6957
Facsimile: 888-329-0305
andyperrong@gmail.com

23